UNITED STATES BANKRUPTCY JUDGE
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
In re:                                                :
                                                      :
INDHIRA G. RAMIREZ,                                   :
                                                      :
                          Debtor.                     :          Chapter 7
-------------------------------------------------------X          Case No. 12-12467 (SMB)
THE KURLAND GROUP and                                 :
GREGORY MESSER, as Trustee of the                     :
Estate of Indhira G. Ramirez,                         :
                                                      :
                          Plaintiffs,                 :
                                                      :
                       –against–                      :          Adv. P. No. 14-01798 (SMB)
                                                      :
FNBN I, LLC,                                          :
                                                      :
                          Defendant.                  :
-------------------------------------------------------X

## MEMORANDUM DECISION REGARDING MOTION TO DISMISS AND MOTIONS FOR SUMMARY JUDGMENT

**A P P E A R A N C E S:**

THE KURLAND GROUP
*Attorneys for Plaintiff The Kurland Group*
160 Broadway – East Building, 11th Floor
New York, New York 10038

      Yetta G. Kurland, Esq.
        Of Counsel

LAMONICA HERBST & MANISCALCO, LLP
*Attorneys for Plaintiff Gregory Messer*
3305 Jerusalem Avenue
Wantagh, New York 11793

      Gary F. Herbst, Esq.
        Of Counsel

FRENKEL LAMBERT WEISS WEISMAN & GORDON, LLP
*Attorneys for Defendant FNBN I, LLC*
One Whitehall Street
New York, NY 10004

> Barry M. Weiss, Esq.
> Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

This adversary proceeding centers on a dispute among the estate of Indhira G. Ramirez, (the "Debtor"), the Kurland Group ("Kurland") her former attorneys, and FNBN I, LLC (the "Defendant"), the putative first mortgagee, to the proceeds of the sale of property located at 11 Rainbow Court, Middle Island, New York 11953 (the "Property"). The Defendant has moved to dismiss Count I of the *Second Amended Complaint for Declaratory Relief and Equitable Subordination*, dated June 4, 2014 ("SAC") (ECF Doc. # 16)),[1] and both sides have moved for summary judgment on some or all of the Plaintiffs' claims. For the reasons discussed below, the Defendant's motion to dismiss Count I of the SAC is granted with leave to replead, and its motion for summary judgment dismissing Count III is granted. All other motions are denied.

## BACKGROUND

The facts relating to the motion to dismiss are derived from the non-conclusory, factual allegations in the SAC, the documents attached to the SAC and those documents on which the Plaintiffs' claims are based. The facts relating to the cross-motions for summary judgment are taken from the parties' submissions in connection with those motions and are discussed separately in a later section of this decision.

---

[1]     "ECF" refers to the electronic docket in this adversary proceeding. "ECF Case" refers to the electronic docket in the bankruptcy case.

2

Kurland is a New York law firm that formerly represented the Debtor.  (SAC ¶ 13.)  It

asserts a charging lien against the proceeds of the Property.  (SAC ¶¶ 17, 48.)  The Plaintiff

Gregory Messer is the trustee of the Debtor's estate (the "Trustee").  (SAC ¶ 14.)  The Defendant

purports to be the holder of a note secured by a mortgage on the Property.  (SAC ¶ 15.)  In

substance, the Plaintiffs contend that the Debtor was the victim of predatory and fraudulent

lenders who induced the Debtor to sign a mortgage on a home in which she never intended to

live and does not currently reside.  (SAC ¶¶ 2-4, 8.)

The unusual tale begins with Joseph and Myrna James.  On or around December 12,

2002, the Jameses, the owners of the Property at the time, conveyed the Property to their

daughter Keisha McCloud, (SAC ¶ 38,)[2] but the deed was not recorded until August 20, 2003.

(SAC, Ex. B.)  McCloud subsequently took out a mortgage financed by First Mutual

Corporation.  (SAC ¶ 38.)  By the middle of 2003, the First Mutual debt was approximately

$282,000.  (*See* SAC ¶ 39 & Ex. J.)

First Mutual was not licensed to make loans in New York State, (SAC ¶ 39), and had to

be taken out.  According to the SAC, a "team" of three individuals—then-attorney, Matthew

Blank, who resigned from the New York State Bar rather than face charges of professional

misconduct, Frank P. Ciano, an unlicensed mortgage broker who served prison time for his role

in a fraudulent scheme involving the financing of speculative residential real estate and Deen

Salami, an employee of First Mutual and later the First National Bank of Arizona ("Bank

Arizona")—orchestrated a scheme to dupe the Debtor in order to take out the First Mutual debt.

(SAC ¶¶ 40-42.)  The scheme involved several steps.  First, on or about May 20, 2003, the

---

[2]        The SAC puts the date of the conveyance at December 12, 2012.  (*See* SAC ¶ 38.)  The year is an error.

Jameses entered into a contract of sale with the Debtor to sell the Property (previously

transferred to McCloud) for a price of $365,000.  The Debtor's signature on the contract

misspelled her first name and was obviously forged.  (SAC, Ex. D.)  Second, the Debtor

borrowed the purchase price from Bank Arizona and executed a note dated July 18, 2003 in the

sum of $346,750 (the "Note") payable to Bank Arizona and a mortgage on the Property (the

"Mortgage") securing the Note.  Although the Note was payable to Bank Arizona, the Mortgage

was granted to the Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for

Bank Arizona.  Third, the proceeds of the loan were used to pay the purchase price, and in the

process, satisfy the First Mutual debt.  According to the closing documents, (*see* SAC, Ex. J), the

Jameses received net proceeds in the sum of $351,855.  First Mutual agreed to accept $229,000

in satisfaction of its debt.[3]

The deed delivered to the Debtor, presumably at the closing, was not recorded until May

7, 2004, or after McCloud recorded her deed.  (SAC Ex. B.)  McCloud subsequently conveyed

the Property to the Jameses, as husband and wife, and the Debtor, and that "no consideration

deed" was recorded on November 4, 2004.  (*Id.*)  As a result of these various transactions, the

Jameses were part owners of and continued to reside at the Property, they were relieved of their

personal obligations on the First Mutual debt, the Debtor retained only a partial interest in the

Property and lived elsewhere, but the Debtor was solely responsible for repayment of the Note.

The Debtor filed this chapter 7 case on June 6, 2012 and has received her discharge.

(*Discharge of Debtor*, dated Dec. 27, 2012 (ECF Case Doc. # 18).)  Thus, she has no personal

---

[3]      The SAC alleges that the Defendant or its predecessors retained $80,000 in proceeds, referring to the
attached Ex. J as support.  (SAC ¶ 39; *accord* ¶ 46.)  Exhibit J, however, does not indicate that the Defendant or
anyone else other than the Jameses received the balance of the purchase price.

4

liability for the obligation evidenced by the Note.  In addition, the Trustee has sold the Property

for a gross purchase price of $255,000 and holds the balance of the purchase price pending

further order of the Court.  (*Order Confirming the Chapter 7 Trustee's Public Sale of the

Debtor's Real Property*, dated Feb. 18, 2015 (ECF Case Doc. # 69).)  The liens asserted by the

Defendant and Kurland in the Property have attached to the proceeds with the same priority they

had in the Property as of the date that the bankruptcy case was commenced.  (*Order: (I)*

*Authorizing and Scheduling the Public Auction Sale of Debtor's Real Property Located at 11*

*Rainbow Court, Middle Island, New York 11953, Free and Clear Of All Liens, Claims and*

*Encumbrances; and (II) Approving the Terms and Conditions of Sale*, dated Dec. 22, 2014 (ECF

Case Doc. # 65).)  At this point, this is a fight over the proceeds.

**A.      The Adversary Proceeding**

Kurland filed this adversary proceeding prior to the sale on January 30, 2014, and the

Trustee subsequently joined as a plaintiff.  The SAC asserted three Counts.  Count I sought a

judgment that the Defendant's mortgage lien was invalid because the Defendant cannot establish

ownership of the alleged Mortgage.  (SAC ¶ 55.)  The SAC did not allege that the Defendant

was not the holder of the Note and Mortgage or challenge the assignments of the Note and

Mortgage, described below, into the hands of the Defendant although the Plaintiffs did allege

"upon information and belief" that the Defendant had not shown that it was the lawful holder of

the Mortgage.  (SAC ¶ 33.)  Instead, the theory of Count I was that the Defendant was precluded

from claiming that it was the holder of the Note and Mortgage because the state court had

dismissed a prior foreclosure suit brought by J.P. Morgan Chase Bank, N.A. ("Chase"), the

Defendant's predecessor in interest, for want of prosecution and had denied the Defendant's

motion to be substituted for Chase.  (*See* SAC ¶¶ 24-32.)

5

Count II sought an order denying and/or subordinating the Defendant's interest to Kurland's attorney charging lien.  (SAC ¶ 57.)

Count III sought a judgment that Kurland held a charging lien in the sum of $126,300 plus statutory interest that was secured by the Property and was superior to the Defendant's alleged mortgage.  (SAC ¶ 59.)

**B.    The Motions**

The Defendant moved to dismiss Counts I and III and moved for summary judgment on all claims.  The Plaintiffs cross-moved for summary judgment on Counts I and II.  The Court reserved decision on Count I pending further briefing on two issues: the effect of the dismissal of the Chase foreclosure suit for want of prosecution, and assuming it precluded another foreclosure suit, did the dismissal bar the Defendant from asserting its status as the holder of a claim in this bankruptcy case secured by a lien on the Property.  The Court also reserved decision on Count III.  Finally, the Court denied the motion and cross-motion for summary judgment directed at Count II.  The Court directed the parties to settle a proposed order memorializing the rulings, but they never did.

## DISCUSSION

### A.    Count I

An understanding of the arguments and disposition of the motions relating to Count I requires a discussion of the prior state court proceedings as reflected in the two opinions attached to the SAC.

#### 1.        The Mayer Decision

Chase commenced a foreclosure action on January 17, 2006 in the Supreme Court, Suffolk County following the Debtor's default.  Standing to foreclosed required Chase to hold the Note and Mortgage at the time it commenced the foreclosure suit.  *U.S. Bank, N.A. v. Collymore*, 890 N.Y.S.2d 578 (N.Y. App. Div. 2009).  At some point, First National Bank of Nevada ("Bank Nevada") allegedly acquired the Note and Mortgage.  It thereafter moved to be substituted for Chase and sought summary judgment.  Although Chase was by then gone from the picture, Bank Nevada's motion still depended on Chase's standing at the time it commenced the foreclosure action.

The state court denied both aspects of the motion by Order of Justice Peter H Mayer, dated June 25, 2009 ("Mayer Decision").[4]  The court observed that the papers submitted by Bank Nevada included inconsistencies, and failed to demonstrate that Chase, the original plaintiff, owned the Note at the time it commenced the foreclosure.  If Chase lacked standing to foreclose when it commenced the action, the defect could not be cured through an assignment.  Accordingly, triable issues of fact existed as to whether the Note was assigned to Chase prior to the action.  (Mayer Decision at 3.)

---

[4]        A copy of the Mayer Decision is annexed to the SAC as Exhibit F.

##        2.        The Baisley Decision

It appears that there was no further effort to prosecute the foreclosure action, certainly not

by Chase, during the next two years.  Following the Debtor's demand and Chase's failure to

resume the prosecution of the foreclosure suit, the Debtor moved pursuant to N.Y. C.P.L.R.

("CPLR") 3216 to dismiss for want of prosecution, arguing that Chase lacked standing and had

effectively abandoned the action.

In the interim, the FDIC had taken over the failed Bank Nevada, and the Defendant had

succeeded through the assignment by the FDIC to Bank Nevada's interests in the Note and

Mortgage.  The Defendant cross-moved for an order permitting it to be substituted as plaintiff on

the ground that it had lawfully succeeded to the rights of the FDIC in connection with the Note

and Mortgage following the FDIC's takeover of Bank Nevada.  In addition, the Defendant

sought summary judgment against the Debtor and the appointment of a referee to compute the

amount due under the Note and Mortgage.

The Court denied both aspects of the Defendant's motion by Order of Justice Paul J.

Baisley, Jr., dated Feb. 18, 2011 ("Baisley Decision") for the same reasons previously stated by

Justice Mayer.[5]  After recounting the documentation submitted by the Defendant to demonstrate

that it held the Note and Mortgage, (*see* Baisley Decision at 3), the court stated that "[c]ontrary

to the conclusory assertions by the attorney for FNBN I, the documentary evidence submitted in

support of its cross motion fails to demonstrate that Chase was, in fact, the lawful holder of the

note when the action was commenced."  (*Id.* at 4-5.)  The court noted that the purported

---

[5]        A copy of the Baisley Decision is annexed to the SAC as Exhibit E.

endorsement of the note given by the Debtor to Bank Nevada[6] appeared on a separate page

bearing Bank Nevada's letterhead, was not dated, and did not comply with the requirements of

the UCC § 3-302.  Moreover, the "purported assignment" to Chase stated that MERS, as

nominee of Bank Arizona rather than Bank Nevada, assigned and transferred the mortgage to

Chase.  Similarly, the purported assignments from Chase back to Bank Nevada and from the

FDIC to the Defendant stated only that assignor's interest in the Mortgage was being assigned.

(*Id.* at 4.)

Separately, the court granted the Debtor's motion to dismiss the foreclosure action for

want of prosecution.  (*Id.*)

### 3.      The Parties' Arguments

The Defendant initially argues that Kurland lacks standing to maintain her claims.  She is

not a party to the Note or Mortgage, has no obligations thereunder, and has no legally protected

interest affected by the Defendant's enforcement of the Note and Mortgage.  As to the principal

dispute, the Defendant contends that it is the holder of the Note and Mortgage and has the right

to enforce its secured claim.  As the purchaser of the Note from the FDIC, the Defendant is not

subject to the claims by Kurland.

Furthermore, the state court decisions do not foreclose the Defendant's right to enforce

the Note and Mortgage.  The state court made an interlocutory determination that the evidence

failed to demonstrate that Chase was the lawful holder of the Note and Mortgage *at the time* it

commenced the foreclosure action.  Had the state court made a final determination, it would have

dismissed the action on the grounds that Chase did not have standing.  Even a final determination

---

[6]        The Debtor gave the Note to Bank Arizona, not Bank Nevada.

on the merits would only mean that Chase was not the holder of the Note at the time the
foreclosure action was commenced.  The state court did not decide that Chase never held the
Note or rule on the Defendant's status as the holder of the Note following its acquisition from the
FDIC.

In response, the Plaintiffs contend that even if Kurland lacks standing, the Trustee
certainly has standing.  Furthermore, the Defendant has failed to establish its ownership of the
subject mortgage, and the *Rooker-Feldman* doctrine prevents the Defendant from seeking review
of the state court decisions in this Court.  At oral argument, the Plaintiffs urged, as they had in
their brief, that dismissal for want of prosecution constituted a determination on the merits that
precluded the Defendant from asserting its secured claim in this bankruptcy case.  The Court
asked the parties to submit supplemental memoranda of law on this issue, and whether the
dismissal for want of prosecution barred the Defendant from asserting its status as the holder of a
claim in this bankruptcy case secured by a lien on the Property.

### 4.    The Motion to Dismiss for Legal Insufficiency

At the outset, I conclude that the Plaintiffs have standing.  The Defendant does not
contest the Trustee's standing, and Kurland has standing in her own right.  She, like the
Defendant, asserts a security interest in the Property and the sale proceeds superior to any
security interest held by the Defendant.  Constitutional, or Article III standing, "imports
justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the
defendant within the meaning of Art. III."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  To
establish Article III standing, a party must show (1) an injury in fact that is actual or imminent
rather than conjectural or hypothetical, (2) the injury is "fairly traceable" to the conduct
complained of, and (3) it is likely, as opposed to speculative, that the injury will be redressed by

10

a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Kurland will

be injured to the extent that the Defendant asserts a secured claim in the sale proceeds that

primes her own security interest, and her injury can be redressed by a determination that the

Defendant's security interest is invalid or that hers is superior. In addition, she is asserting her

own rights and therefore has prudential standing. *See Warth*, 422 U.S. at 499; *Rajamin v.

Deutsche Bank Nat'l Trust Co.*, 757 F.3d 79, 86 (2d Cir. 2014).

Next, the dismissal for want of prosecution does not preclude the Defendant from seeking

to enforce its secured claim. Unless the order dismissing an action for want of prosecution under

CPLR 3216 specifies otherwise, the dismissal is not on the merits, CPLR 3216(a), and does not

bar a subsequent action between the same parties based on the same or similar claims. *Ziegler v.

Serrano*, 905 N.Y.S.2d 297, 299 (N.Y. App. Div. 2003). The Baisley Decision did not state that

the dismissal of the Chase foreclosure under CPLR 3216 was on the merits, and the Plaintiffs

have not produced an order stating that it was.

Nor do the state court decisions prevent the Defendant from asserting that is the holder of

the Note and Mortgage. Initially, the Plaintiffs' reliance on the *Rooker-Feldman* doctrine is

misplaced. "*Rooker-Feldman* bars the federal courts from exercising jurisdiction over claims

'brought by state-court losers complaining of injuries caused by state-court judgments rendered

before the district court proceedings commenced and inviting district court review and rejection

of those judgments.'" *Sykes v. Mel S. Harris & Assocs. LLC*, No. 13-2742-cv, 2015 WL 525904,

at *22 (2d Cir. Feb. 10, 2015) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S.

280, 284 (2005).) The *Rooker-Feldman* doctrine applies where the following four elements are

present:

11

First, the federal-court plaintiff must have lost in state court. Second, the plaintiff
must have "complain[] of injuries caused by [a] state-court judgment[.]" Third, the
plaintiff must "invite district court review and rejection of [that] judgment[]."
Fourth, the state-court judgment must have been "rendered before the district
court proceedings commenced."

*Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005) (quoting *Exxon Mobil*,

544 U.S. at 459). Viewing the Defendant as the plaintiff in this formulation, it is not claiming an

injury caused by the state courts' decisions or inviting this Court to review or reject its

judgments.

Instead, the issue is one of collateral estoppel; do the state court decisions, and

particularly the Baisley Decision, denying the substitution motions in the Chase foreclosure

action now preclude the Defendant from seeking to bring another foreclosure action, or assert its

rights as a secured creditor in this bankruptcy case? Under New York law, which governs this

case, collateral estoppel applies where "[f]irst, the identical issue necessarily must have been

decided in the prior action and be decisive of the present action, and second, the party to be

precluded from relitigating the issue must have had a full and fair opportunity to contest the prior

determination." *Jenkins v. City of New York*, 478 F.3d 76, 85 (2d Cir. 2007) (quoting *Juan C. v.

Cortines*, 679 N.E.2d 1061, 1065 (N.Y. 1997) (internal citation and quotation marks omitted)).

The Plaintiffs fail to satisfy the first prong because the issue before the state court was not

identical to the issue before this court. The state court had to decide as a threshold matter

whether Chase owned the Note and Mortgage at the time it commenced a foreclosure action. It

lacked standing if it did not, and its lack of standing could not be cured by the substitution of the

current holder of the Note and Mortgage. The state court denied substitution motions as well as

motions for summary judgment, first by Bank Nevada and then by the Defendant, on the basis

that the documents failed to establish Chase's ownership at the time it commenced a foreclosure

action.  At most, the state court's decisions might preclude the Defendant and its predecessors

from arguing that Chase held the Notes and Mortgage at the time it commenced a foreclosure

action.  That determination, even if binding, does not conflict with the notion that Chase validly

acquired the Note through assignment after it commenced the action or that the Defendant

subsequently acquired the Note and Mortgage.

The Baisley Decision did criticize the evidence that the Defendant submitted in that

proceeding and many of the same defects and others are highlighted below.  Nevertheless,

Justice Baisley's criticisms do not change the issue he had to decide, and must be considered in

light of that issue.  For example, he observed that the indorsement from Chase to Bank Nevada

appeared on Bank Nevada's letterhead and was not dated, and concluded that the indorsement

did not comply with the requirements of UCC § 3-302.  (Baisley Decision at 5.)  The undated

indorsement was certainly relevant to when Chase acquired the Note,[7] but there is no

requirement that an indorsement be dated.  *See* UCC 3-204.  Furthermore, UCC § 3-302 governs

the status of the holder in due course, and the Defendant is not claiming standing as a holder in

due course under the UCC, but rather, as a simple holder with the right, as holder, to enforce the

Note.  (*FNBN I, LLC's Memorandum of Law in Support of Motion to Dismiss and Motion for

Summary Judgment*, dated Sept. 19, 2014, at 13-14 (ECF Doc. # 47).)

---

[7]        The state court's citation to *U.S. Bank, N.A. v. Collymore*, 890 N.Y.S.2d 578 (N.Y. App. Div. 2009)
confirms that Justice Baisley referred to the undated nature of the Note for this reason.  In *Collymore*, the court
denied summary judgment to the plaintiff bank on the ground that it had failed to demonstrate that it had acquired
the note prior to the commencement of the foreclosure action.  The supporting affidavit failed to establish that the
note was physically delivered prior to the commencement of the action, and the indorsement was undated.  *Id.* at
580.  The Baisley Decision also cited *Slutsky v. Blooming Grove, Inc.*, 542 N.Y.S.2d 721 (N.Y. App. Div. 1989).
There, the defendant alleged that the original mortgagee lacked standing to foreclose because it had assigned the
note.  The court rejected the argument, observing that the note produced by the defendant did not include an
indorsement and concluding that the note was never validly transferred by the plaintiff.  *Id.* at 723.

The Baisley Decision also pointed out that the documents evidenced the assignment of the Mortgage (but not the Note) by MERS, as nominee of Bank Arizona rather than Bank Nevada[8] to Chase, and from Chase to Bank Nevada and from the FDIC to the Defendant. The inconsistent trail depicted in the assignments of the Note and Mortgage cause concern and are discussed later. However, as explained shortly, he Defendant's rights as a holder turn on the validity of the assignments of the Note rather than the Mortgage.

In short, the prior state court decisions do not preclude the Defendant from asserting that it is a holder of the Note (and Mortgage) with the right to enforce its security interest in the Property. As the SAC does not allege facts otherwise challenging the indorsements on the Note, Count I is legally insufficient and must be dismissed. The Plaintiff's requested leave to replead Count I at oral argument if necessary. Whether repleading would be futile depends upon the disposition of the Defendant's motion for summary judgment dismissing Count I, the next order of business.

### 5.    The Defendant's Motion for Summary Judgment

A mortgage is an incident to the debt represented by the note that it is intended to secure. *Merrill v Bartholick*, 36 N.Y. 44, 45 (1867). Where a note is transferred, a mortgage securing the debt passes as an incident to the note. *Bank of N.Y. v. Silverberg*, 926 N.Y.S.2d 532, 537 (N.Y. App. Div. 2011); *Collymore*, 890 N.Y.S.2d at 580. Conversely, an assignment of a mortgage without the assignment of the underlying note or bond is a nullity. *Bartholick*, 36 N.Y. at 45; *Silverberg*, 926 N.Y.S.2d at 537. Thus, the critical inquiry concerns the assignment of the Note.

---

[8]    The original Mortgage was given to MERS as nominee for Bank Arizona.

No one has disputed that the Note is a negotiable instrument.  *See* N.Y.C.U.C.C.

("UCC") § 3-104(1) (McKinney 2013) (stating the requirements for an instrument to be a

negotiable instrument).  The "holder" of the negotiable instrument has the right to enforce it.

UCC § 3-301.  A "holder" is "the person in possession of a negotiable instrument that is payable

either to bearer or to an identified person that is the person in possession."  UCC § 1-

201(b)(21)(A).

A person can become a holder when the instrument is issued to that person, or he

becomes a holder by negotiation.  UCC § 3-202(1) provides:

> (1) Negotiation is the transfer of an instrument in such form that the transferee
> becomes a holder.  If the instrument is payable to order it is negotiated by delivery
> with any necessary indorsement; if payable to bearer it is negotiated by delivery.
>
> (2) An indorsement must be written by or on behalf of the holder and on the
> instrument or on a paper so firmly affixed thereto as to become a part thereof.

An indorsement may take the form of a special indorsement or a blank indorsement.[9]

UCC 3-204 provides:

> (1) A special indorsement specifies the person to whom or to whose order it
> makes the instrument payable.  Any instrument specially indorsed becomes
> payable to the order of the special indorsee and may be further negotiated only by
> his indorsement.
>
> (2) An indorsement in blank specifies no particular indorsee and may consist of a
> mere signature.  An instrument payable to order and indorsed in blank becomes
> payable to bearer and may be negotiated by delivery alone until specially
> indorsed.
>
> (3) The holder may convert a blank indorsement into a special indorsement by
> writing over the signature of the indorser in blank any contract consistent with the
> character of the indorsement.

The party claiming under the signature has the burden of proof, UCC § 3-307(1)(a), but

the signature is presumed to be genuine and authorized.  UCC § 3-307(1)(b).  "Whenever this act

---

[9]        An indorsement may also be "restrictive," UCC § 3-205, but this dispute does not involve "restrictive" indorsements.

creates a 'presumption' with respect to a fact, or provides that a fact is 'presumed,' the trier of

fact must find the existence of the fact unless and until evidence is introduced that supports a

finding of its nonexistence."  UCC § 1-206.  Once a party introduces evidence challenging the

validity of a signature, the party relying on the signature bears the burden of establishing the

signature by a preponderance of the evidence.  *Genger v. Sharon*, 910 F. Supp. 2d 656, 669

(S.D.N.Y. 2012), *aff'd sub nom. Wachtel Masyr & Missry LLP v. Genger*, 568 F. App'x 10 (2d

Cir. 2014).

The evidence raises serious questions regarding the genuineness of the indorsements

appearing on the various *allonges*[10] annexed to the Note, and ultimately, the Defendant's status

as a holder of the Note.

### a.    The Two Versions of the Allonge

PennyMac Loan Services, LLC ("PennyMac") is the servicer and attorney-in-fact for the

Defendant with respect to the Debtor's loan.  (*See Affidavit [of Mallory J. Garner]in Opposition

to Plaintiff's Motion for Summary Judgment*, sworn to Nov. 10, 2014, at ¶¶ 1, 3 (ECF Doc. #

39).)  Earlier in this bankruptcy case, PennyMac, as servicer, moved for relief from the automatic

stay on behalf of the Defendant.  (*Motion for Relief from Automatic Stay*, dated Feb. 25, 2013

("*Stay Relief Motion*") (ECF Case Doc. # 21).)[11]  Exhibit E to the *Stay Relief Motion* included

the form and work sheet required by Local Bankruptcy Rule 4001-1(c).[12]  In it, Rita Garcia, a

---

[10]    An *allonge* is "[a] slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsements when the original paper is filled with indorsements."  BLACK'S LAW DICTIONARY 92 (2014).

[11]    A copy of the *Stay Relief Motion* and certain exhibits attached to that motion are annexed as Exhibit 4 to the *Declaration of Yetta G. Kurland in Support of Plaintiff's Motion for Summary Judgment*, dated Oct. 20. 2014 ("*Kurland Declaration*") (ECF Doc. # 35).

[12]    Local Bankruptcy Rule 4001-1(c) provides:

bankruptcy manager with PennyMac, certified under the penalty of perjury that the transactional

documents attached to the *Stay Relief Motion*, including the Note, the Mortgage and any

assignments, were true and accurate copies of the original documents and that the original

documents were in PennyMac's possession.

Exhibit A to the *Stay Relief Motion* included, among other things, the Note made by the

debtor to Bank Arizona and an *allonge* on Bank Nevada letterhead showing that (1) Bank

Arizona specially endorsed the Note to Bank Nevada and (2) Bank Nevada thereafter indorsed

the Note in blank.[13]   There were no other indorsements on the *allonge* or additional *allonges*

attached to the Note.   The Note, as presented, suggested that it became bearer paper once Bank

Nevada indorsed it in blank.   The *Stay Relief Motion* also described subsequent assignments of

the "loan," implying that the Note was negotiated through physical deliver to each holder.

The narrative in the *Stay Relief Motion* and another exhibit described a different chain of

events.   The motion stated that "[t]he loan was assigned from MERS as nominee for First

National Bank of Arizona to JP Morgan Chase Bank, N.A. f/k/a JPMorgan Chase Bank."   (*Stay

Relief Motion* at ¶ 1.)   The statement referred for support to a Corporate Assignment of

---

If the debtor is an individual, a party moving for relief from the automatic stay under section 362
of the Bankruptcy Code relating to a mortgage on real property or a security interest in a
cooperative apartment shall file, as an exhibit to the motion, a completed copy of the following
form. Compliance with this subdivision shall constitute compliance with subdivision (b) of this
rule.

The form is attached as a hyperlink to the Local Rule.

---

[13]      The same person, Amy Hawkins, signed both indorsements in her capacity as "Shipping Officer," of Bank
Arizona and Bank Nevada.

Mortgage, effective as of December 31, 2005, attached as Exhibit B.  According to Exhibit B,

MERS, as nominee for Bank Arizona, assigned the Mortgage "together with the note or notes

therein described" to Chase.[14]  But the Note was indorsed by Bank Arizona to Bank Nevada—

not to Chase—and subsequently indorsed by Bank Nevada in blank.  We will return to the

Corporate Assignment of Mortgage later.

Kurland opposed the *Stay Relief Motion*.  She argued, *inter alia*, that there was no

evidence that the Note had been properly transferred to the Defendant, (*Opposition to Motion for

Relief from the Automatic Stay*, dated Mar. 25, 2013, at 6-9 (ECF Case Doc. # 23)), and the

Defendant withdrew the motion.  (*Kurland Declaration*, Ex. 17.)

PennyMac offered a different version of the *allonge*, which it swore was a copy of a "wet

ink original Note," (*see Garner Affidavit* at ¶ 2), in support of the Defendant's current motion for

summary judgment.  (*See Garner Affidavit*, Ex. 1; *see also Affidavit [of Chris White] in Support

of Motion for Summary Judgment*, sworn to Sept. 17, 2014 ("*White Affidavit*"), Ex. 1, at 9 of 69

(ECF Doc. # 50).)  This version of the *allonge* included a special endorsement by Bank Nevada;

someone had *stamped* "Residential Funding Corporation" ("RFC") between the statement "pay

to the order of" and the previous blank endorsement by Bank Nevada.  (*Garner Affidavit*, Ex. 1,

at 5 of 9.)[15]  In other words, the blank indorsement was changed to a special indorsement.  In

addition, the new *allonge* included a *stamped* special indorsement by RFC together with a

*stamped* signature by Judy Faber of RFC to the order of Chase placed to the immediate right of

the special indorsement to RFC.  (*Id.*)  This version also included four more pages of *allonges*

---

[14]    The Mortgage specifically refers to the Note, defining the "Note" as the note signed by the borrower and dated July 18, 2003 in the sum of $346,750.00.

[15]    The citation "5 of 9" and similar citations used in this decision refer to the numbering imprinted at the top of each page by the Court's ECF system.  Here, "5 of 9" refers to the fifth page of a nine page exhibit.

that purported to transfer the Note through a series of special indorsements to the Defendant. (*Id.* at 6-9 of 9.)

The two contradictory versions of the *allonge*, both presented to the Court as accurate copies of the original, raise serious concerns about the Defendant's candor and its status as a holder of the Note. PennyMac or its attorneys have maintained actual physical possession of the Note since December 29, 2008. (*See White Affidavit* at ¶ 3.) PennyMac certified under the penalty of perjury in the *Stay Relief Motion* that the first *allonge* was an accurate copy of the original which Ms. Garcia had certified was in PennyMac's possession, but PennyMac produced a different version in support of the Defendant's motion for summary judgment. From the "wet ink original" also in its p9ossession. The certification also implied that the first version of the *allonge* was the only indorsement in the chain of title, but has now produced a Note with five pages of *allonges* and more indorsements. "An indorsement must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto as to become a part thereof." UCC § 2-202.

How then could Ms. Garcia have missed the other *allonges* if they were firmly attached to the Note? The answer appears to be that there is more than one version of the Note and *allonges* in PennyMac's possession. The evidence may also suggest that the second version of the *allonges* were executed and the *allonges* were "firmly affixed" to the Note when it was already in PennyMac's possession. In the latter case, the Defendant would have to show that each prior indorser executed the indorsement or authorized the Defendant (or someone else) to indorse the *allonge* on its behalf. In short, the Defendant has failed to explain its proffer of two different versions of *allonges* to this Court.

The contradictory versions of the Note and *allonges* are exacerbated by other documents purporting show yet other chains of title.  As already mentioned, the Corporate Assignment of Mortgage attached to the *Stay Relief Motion* stated that MERS, as nominee of Bank Arizona, assigned the Mortgage "together with the note or notes therein described" to Chase c/o RFC, (*id.*, Ex. 3), but the second *allonge* said that the Note was assigned by Bank Nevada to RFC which, in turn, assigned the Note to Chase.  Furthermore, MERS held the Mortgage as nominee of Bank Arizona but there is no evidence that it was ever the holder of the Note in any capacity.  Thus, although the Corporate Assignment of Mortgage indicated that MERS was also assigning the Note, it lacked the authority to do so.

The papers also include inconsistencies relating to the assignment of the Note and Mortgage by Chase.  According to an *allonge* attached to the Note produced on this motion, Bank of New York Trust Company, N.A., as successor to Chase as Trustee, indorsed the Note back to Bank Arizona.  (*White Affidavit*, Ex. 1 at 10 of 69.)  However, according to a Corporate Assignment of Mortgage recorded on September 28, 2007, Chase (not the Bank of New York Trust Company, N.A.) assigned the Mortgage "together with the note or notes therein described" to Bank *Nevada*.  (*Stay Relief Motion*, Ex. C.)  Thus, Chase or its successor transferred the Note twice to two different entities.

The two versions of the *allonges* and the inconsistencies between the *allonges* and the Corporate Assignments of Mortgage raise questions regarding when the special indorsements were executed and whether the indorser had the authority to indorse the Note at the time.  The conflicting and contradictory versions regarding the history of the transfers of the Note and Mortgage mandates the denial of the Defendant's motion for summary judgment.  *Collymore*, 890 N.Y.S.2d at 580.

20

One final point concerns the Defendant's invocation of the *D'Oench, Duhme* doctrine,
(*see FNBN I, LLC's Memorandum of Law in Support of Motion to Dismiss and Motion for
Summary Judgment*, dated Sept. 19, 2014, at 10-11 (ECF Doc. # 47)), a federal common law rule
that confers holder in due course status on the FDIC and its assigns.  *See Cadle Co. v. Newhouse*,
756 N.Y.S.2d 48, 50 (N.Y. App. Div. 2002) (The *D'Oench, Duhme* doctrine "confers holder in
due course status upon the FDIC to invalidate secret agreements between borrowers and defunct
lenders.").  The doctrine originated with the Supreme Court's decision in *D'Oench, Duhme &
Co. v. FDIC*, 315 U.S. 447 (1942).  There, a bank made a secured loan, and entered into a secret
agreement with the borrower that the note would not be called for payment.  After the bank
failed, the FDIC acquired the borrower's note and sued to recover the loan.  The borrower
asserted the secret agreement as a defense.

The Supreme Court rejected the defense, relying on the federal policy of protecting
federal corporations "from misrepresentations made to induce or influence the actions of [the
FDIC], including misstatements as to the genuineness or integrity of securities in the portfolios
of banks which it insures or to which it makes loans."  *Id.* at 459.  "Plainly, one who gives such a
note to a bank with a secret agreement that it will not be enforced must be presumed to know that
it will conceal the truth from the vigilant eyes of the bank examiners."  *Id.* at 460.

The *D'Oench, Duhme* doctrine has been codified in 12 U.S.C. § 1823(e)(1) as part of the
Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA").  *Duraflex
Sales & Serv. Corp. v. W.H.E. Mechanical Contractors*, 110 F.3d 927, 933 (2d Cir. 1997); *FDIC
v. Suna Assocs., Inc.*, 80 F.3d 681, 685 (2d Cir. 1996); *Inn of Saratoga Assocs. v. FDIC*, 60 F.3d
78, 81 (2d Cir. 1995).  Section 1823(e)(1) provides:

21

No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement (A) is in writing, (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (D) has been continuously, from the time of its execution, an official record of the depository institution.

The continuing viability of the *D'Oench, Duhme* federal common law doctrine has been called into question as a result of the Supreme Court's decision in *O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994) and the enactment of § 1823(e). *O'Melveny* involved the question of whether a suit in tort by the FDIC, as receiver of a failed federally insured bank, against the bank's attorneys was governed by federal law or state law. *Id.* at 80-81. While not mentioning *D'Oench, Duhme* specifically, the Supreme Court held that the enactment of the detailed statutory scheme of FIRREA left no room for federal banking common law. *See id.* at 85-87. In concluding that state law governed the liability of the attorneys, the Court admonished federal courts not to create federal common law rules absent a significant conflict between state law and an identifiable federal policy. *Id.* at 87-88; *accord Atherton v. FDIC*, 519 U.S. 213, 218 (1997).

The Circuit Courts of Appeal have split on whether *O'Melveny* and § 1823(e)(1) have abrogated the federal common law *D'Oench, Duhme* doctrine. *Compare FDIC v. Deglau*, 207 F.3d 153, 171 (3d Cir. 2000) ("We agree with the Eighth, Ninth and D.C. Circuits that *D'Oench* is not applicable federal common law in light of *O'Melveny* and *Atherton*.") *with Commercial Law Corp., P.C. v. FDIC*, 777 F3d 324, 329 (6th Cir. 2015) (concluding that § 1823(e)(1) complements rather than displaces *D'Oench, Duhme*) (citing *Hall v. FDIC*, 920 F.2d 334, 339 (6th Cir.1990), *cert. denied*, 501 U.S. 1231 (1991)); *Motorcity of Jacksonville, Ltd. v. Southeast*

22

*Bank, N.A.*, 120 F.3d 1140, 1144 (11th Cir. 1997) (concluding that *D'Oench, Duhme*, was not overruled); *Young v. FDIC*, 103 F.3d 1180, 1187 (4th Cir. 1997) ("Section 1823(e) essentially encompasses the principles of the common-law *D'Oench* doctrine," but does not pre-empt it, and "the common-law doctrine and the statute remain separate and independent grounds for decision.")

Post-*O'Melveny* decisions in the Second Circuit leave the precise status of the doctrine unclear. In *Duraflex*, Hemingway entered into a secured construction loan borrowing $3.95 million from Charter Federal Savings & Loan. *Duraflex*, 110 F.2d at 929. Duraflex, a subcontractor, subsequently filed a mechanic's lien. Hemingway thereafter borrowed more funds, and Charter Bank agreed to subordinate some of its rights in favor of the new lender. After Charter Bank failed, the Resolution Trust Corporation ("RTC") was appointed receiver and sought to foreclose its security interests in the project. *Id.* at 929-30.

One of the issues the Court had to decide was whether the subordination agreement could be enforced to defeat the RTC's priority over the Duraflex lien. The Court discussed *D'Oench, Duhme* in historical context as the predecessor to § 1823(e)(1). *Id.* at 933. After noting certain differences between *D'Oench, Duhme* and § 1823(e)(1), the Court focused exclusively on § 1823(e)(1) in considering whether the subordination agreement was enforceable against the RTC. *See id.* at 933-34. The Court did not decide the issue, and ultimately affirmed the district court on the ground that even if the subordination agreement was enforceable against the RTC, it would not give Duraflex priority under state law. *Id.* at 934.

*Duraflex* implies that § 1823(e)(1) supplanted *D'Oench, Duhme* although the Court did not say this. Furthermore, two years earlier, *Inn at Saratoga*, which *Duraflex* did not cite,

rejected the District Court's reliance on § 1823(e), and instead, reached its decision based on

*D'Oench, Duhme. Inn at Saratoga*, 60 F.3d at 82-83. The Defendant's submissions did not

discuss § 1823(e)(1)[16] or the continuing viability of *D'Oench, Duhme* as a doctrine separate from

§ 1823(e)(1).

Moreover, even if *D'Oench, Duhme* or § 1823(e)(1) applied, the Defendant would first

have to demonstrate that it is a holder of the Note. *Cf. Marine Midland Bank, N.A. v. Price,*

*Miller, Evans & Flowers*, 441 N.E.2d 1083, 1085 (N.Y. 1982) ("In this case it is conceded that

the bank is in possession of the check but also conceded that the bank accepted the check without

indorsement. This would generally preclude a person from being a holder, and thus a holder in

due course.") The factual issues relating to the Defendant's status as a holder do not arise from a

secret agreement that would have fooled a bank examiner. The Defendant contends that it

acquired the Debtor's collateral file containing the original loan documents on December 29,

2008. (*Garner Affidavit* at ¶ 2.) That file would have included the Corporate Assignments of

Mortgage that were inconsistent with the *allonge*s and should have suggested a cloud in the

chain of title. In addition, the authority to execute and affix *allonges* after the acquisition of the

collateral file, if that occurred, would not implicate *D'Oench, Duhme* or § 1823(e)(1).

Given the muddled and contradictory provenance of the Note, the Court cannot conclude

as a matter of law that the Defendant is a "holder" of the Note. Accordingly, the Defendant's

motion to dismiss Count I pursuant to Rule 12(b)(6) is granted, its motion for summary judgment

---

[16]     The only mention of § 1823(e)(1) appeared in a quotation from a case, but the Defendant did not discuss
the reference or the statute. (*See FNBN I, LLC's Memorandum of Law in Opposition to Plaintiff's Motion for
Summary Judgment in Reply on FNBN I, LLC's Motion to Dismiss and for Summary Judgment and Affidavit*, dated
Nov. 10, 2014, at 15 (ECF Doc. # 38).)

dismissing Count I is denied, and the Plaintiffs are granted leave to replead Count I per their request at oral argument.

**\B.      Count III**

Through Count III, Kurland seeks a judgment that she holds a charging lien that is superior to the Defendant's rights under the Mortgage.  The charging lien is a common law device "invented by the courts for the protection of attorneys against the knavery of their clients by disabling clients from receiving the fruits of recoveries without paying for the valuable services by which the recoveries were obtained." *Goodrich v. McDonald*, 19 N.E. 649, 651 (N.Y. 1889); *accord LMWT Realty v. Davis Agency Inc.*, 649 N.E.2d 1183, 1187 (N.Y. 1995); *In re Heinsheimer*, 108 N.E. 636, 637 (N.Y. 1915).  It gives the attorney an equitable ownership interest in the client's cause of action, *LMWT Realty*, 649 N.E.2d at 1186; *see In re Washington Square Slum Clearance*, 157 N.E.2d 587, 590 (N.Y. 1959), *cert. denied* 363 U.S. 841 (1960), and ensures that she can collect her fee from the fund she has created and obtained on behalf of her client.  *Rosenman & Colin v. Richard*, 850 F.2d 57, 61 (2d Cir. 1988); *see Gordon v. Shirley Duke Assocs. (In re Shirley Duke Assocs.)*, 611 F.2d 15, 18 (2d Cir. 1979).

The charging lien is codified in section 475 of New York's Judiciary Law which provides, in relevant part:

> From the commencement of an action, special or other proceeding in any court . . . the attorney who appears for a party has a lien upon his client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, judgment or final order in his client's favor, and the proceeds thereof in whatever hands they may come . . . .

The statute enlarges the common law charging lien to the extent that it now attaches to the cause of action even before judgment, but otherwise remains what it was at common law.  *In re Heinsheimer*, 108 N.E. at 637; *see LMWT Realty*, 649 N.E.2d at 1186.

25

"The prerequisites to the creation of a charging lien are well-settled; as a result of the attorney's efforts, (1) the client must assert a claim, (2) which can result in proceeds (3) payable to or for the benefit of the client." *Cassirer v. Invex, Ltd.* (*In re Schick*), 215 B.R. 13, 15 (Bankr. S.D.N.Y. 1997); *accord United Orient Bank v. 450 West 31st Street Owners Corp.*, 589 N.Y.S.2d 390, 390 (N.Y. Sup. Ct. 1992). Accordingly, a defendant's attorney cannot obtain a charging lien unless her client asserts a counterclaim. *United States v. J.H.W. & Gitlitz Deli & Bar, Inc.*, 499 F. Supp. 1010, 1014 (S.D.N.Y. 1980) (Weinfeld, J.); *United States v. Clinton*, 260 F. Supp. 84, 90 (S.D.N.Y. 1966); *Ekelman v. Marano*, 167 N.E. 211, 212 (N.Y. 1929); *Nat'l Exhibition Co. v. Crane*, 60 N.E. 768, 769 (N.Y. 1901); *United Orient Bank*, 589 N.Y.S.2d at 390-91. Finally, there must be proceeds upon which the lien can affix. *Banque Indosuez v. Sopwith Holdings Corp.*, 772 N.E.2d 1112, 1117 (N.Y. 2002).

Kurland was retained by the Debtor on November 11, 2005 to remove the Debtor from the Mortgage and her ownership of the Property and her mission included the commencement of a partition action. (*Kurland Declaration*, Ex. 18.) It appears that Kurland filed a partition action on behalf of the Debtor against the Jameses and McCloud on or about February 14, 2006, they failed to answer and the Debtor moved for a default judgment. The Supreme Court, Suffolk County, ordered the sale of the Property, and by Order of Settlement, dated Sept. 18, 2006, (*Kurland Declaration*, Ex. 16), *inter alia*, awarded the debtor damages in the sum of $126,300 consisting of unpaid rent ($50,460), costs and disbursements ($1,200) and legal fees ($74,640.00), plus statutory interest, all to be paid from the proceeds of the sale. The order also directed Kurland to hold any remaining balance in escrow pending a hearing to determine the distribution of the balance. Kurland also successfully represented the Debtor in procuring the dismissal of the Chase mortgage foreclosure action for want of prosecution and opposing the

26

efforts by Bank Nevada and the Defendant to be substituted for Chase and obtain summary
judgment against the Debtor.

I assume that Kurland holds a valid charging lien in the proceeds of any sale of the
Property to the extent that she represented the debtor in the partition action against the Jameses
and McCloud, and her efforts resulted in the monetary award.[17]  The general New York rule in
determining the priority of liens is "first in time, first in right."  *Granite Commercial Indus. LLC
v. Landmark Am. Insur. Co.*, 909 F. Supp. 2d 191, 194 (E.D.N.Y. 2012).  An attorney's charging
lien does not supersede a prior lien on property.  *United States v. Certain Lands in Town of
Highlands, N.Y.*, 49 F. Supp. 962, 968 (S.D.N.Y. 1943) ("An attorney's lien does not take
precedence over liens already encumbering the property."); *Gates v. De La Mare*, 37 N.E. 121,
123 (1894) (holding that an attorney's charging lien in a condemnation award was subordinate to
prior mortgage on the condemned property); *In re Queens Blvd., City of New York*, 3 N.Y.S.2d
775, 776 (N.Y. App. Div. 1938) (same); *In re New Utrecht Ave. in City of New York*, 172 N.Y.S.
586 (N.Y. App. Div. 1918) (same).

Here, the Mortgage was signed on July 18, 2003 and recorded on May 7, 2004.  Kurland
acquired a charging lien when she was retained pursuant to a personal contract with the debtor on
November 11, 2005, after the Mortgage.  The Defendant was not a party to the retainer
agreement or the retention of Kurland.  The Defendant was also not a party to the partition action
and is not bound by the order directing the payment of the sale proceeds to the Debtor.  Under

---

[17]     On the other hand, I question whether she acquired a lien for her fees in connection with opposing the
Chase foreclosure action.  The debtor did not assert a claim for monetary relief, or at least, did not obtain a judgment
or verdict, and Kurland's services did not generate any proceeds to which a lien could affix.

the New York general rule, the Defendant's Mortgage is first in time and therefore first in right, and has priority over Kurland's charging lien.

*LMWT Realty*, which Kurland cites to support her position that "[a] pre-petition attorney's lien is superior to a mortgage claim," (*Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment*, dated Oct. 20, 2014, at 26 (ECF Doc. # 34)), is distinguishable.  There, the plaintiff owned two buildings that were extensively damaged by fire.  The plaintiff retained an attorney to recover the fire insurance proceeds on a one-third contingency basis.  The action was settled for $130,000, but the insurer refused to issue the settlement check because the City of New York had previously filed a lien for unpaid property taxes and other charges against the proceeds of the policy pursuant General Municipal Law § 22.[18]  *LMWT Realty*, 649 N.E.2d at 1184.

While acknowledging that the City had chronological priority, the New York Court of Appeals nonetheless held that the charging lien had priority because the attorney's efforts created the very collateral against which the City also asserted a lien:

> However, there is an additional equitable factor which is dispositive here: the attorney's services created the fund at issue, and under those circumstances the attorney's charging lien must be given effect, even though a prior lien against the specific fund exists.

*Id.* at 1186.

---

[18]    General Municipal Law § 22(2) authorizes tax districts to file claims for unpaid taxes and assessments against the proceeds of a policy of fire insurance insuring an owner of real property, and provides that the claim constitutes a lien against the policy proceeds which "shall . . . be prior to all other liens and claims except the claim of a mortgagee of record named in such policy."

*LMWT Realty* reflects an equitable exception to the general rule of lien priority where the attorney's efforts create the collateral to which competing liens affix. "To allow the City to recover the entire fund created by the attorney's efforts would be inequitable." *Id.* at 1187.

Unlike the attorney in *LMWT Realty*, Kurland's services did not create the collateral—the Property. Moreover, Kurland undertook her duties with actual knowledge of the Mortgage because she was retained with the express purpose of relieving the Debtor of the obligations imposed by the Mortgage. Consequently, the equities that favored the attorneys in *LMWT Realty* are not present here. Accordingly, the Defendant's motion for summary judgment dismissing Count III is granted.

Settle order on notice.

Dated: New York, New York
      March 27, 2015

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge